Filed 1/30/15  P. v. Enriquez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAMIRO ENRIQUEZ,<br><br>    Defendant and Appellant. | F065288<br><br>(Kern Super. Ct. No. BF137853B)<br><br><br>**OPINION** |
| THE PEOPLE<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL RAMOS,<br><br>    Defendant and Appellant. | F065481<br><br>(Kern Super. Ct. No. BF137853A) |
| THE PEOPLE<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RENE GUTIERREZ, JR.,<br><br>    Defendant and Appellant. | F065984<br><br>(Kern Super. Ct. No. BF137853C) |

APPEAL from a judgment of the Superior Court of Kern County. Michael E. Dellostritto, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Ramiro Enriquez.

Donn Ginoza, under appointment by the Court of Appeal, for Defendant and Appellant Gabriel Ramos.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant Rene Gutierrez, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Ramiro Enriquez, Gabriel Ramos, and Rene Gutierrez, Jr. (collectively, defendants) of attempted premeditated murder, assault with a firearm, and active participation in a criminal street gang. The gang enhancement also was found true as to Gutierrez and Enriquez. They raise multiple challenges to their convictions, including insufficiency of the evidence, evidentiary error, instructional error, prosecutorial misconduct, abuse of discretion to deny a mistrial motion, ineffective assistance of counsel, and error pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

We reject their contentions and affirm the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

On the evening of July 29, 2011, about 15 to 20 people were at Melissa Schuetze's apartment. Among those at the apartment were Gutierrez, Enriquez, and Kyle Fuller. They were smoking marijuana and using methamphetamine.

Schuetze, Gutierrez, Enriquez, Fuller, and others drove to the Western Knights Motel in Fuller's red SUV to pick up more drugs. Prior to leaving, Gutierrez placed a

2.

sawed-off shotgun in the SUV; Schuetze saw the shotgun wedged between the front passenger seat and the door. Fuller drove and Gutierrez and Schuetze were in the backseat. On the way to the motel, Gutierrez gave Schuetze two shotgun shells, which she placed in her bra.

When Fuller arrived at the motel, Gabriel Trevino and Ramos already were there. Enriquez, Fuller, and three women went into a vacant room to smoke marijuana and methamphetamine. Ramos joined the group, using drugs for a while, and then headed outside. At some point, Enriquez and Gutierrez went outside as well.

Fuller heard Ramos starting an argument outside. Schuetze also could hear the argument and looked outside. Gutierrez was in the area where the argument was occurring. Fuller and the women started to leave the room, but Enriquez instructed them to go back inside. While in the doorway, Fuller could see Ramos arguing with a Black man.

Ramos came up to the room and asked for a ride. Fuller went to his SUV and climbed into the driver's seat, Gutierrez got in the front passenger seat, and Enriquez and Trevino got in the backseat. As Fuller drove away, Gutierrez pulled out a shotgun and told him where to drive.

Gutierrez asked Enriquez what he wanted to do and Enriquez responded, "[W]hatever you want to do my boy, whatever you want to do." Gutierrez told Fuller to stop and jumped out of the SUV. Gutierrez began firing at a Black man that looked like the man Ramos had been arguing with in the motel parking lot. Gutierrez fired three shots at the Black man, got back into the SUV, and they drove away.

As they drove away, Trevino instructed Fuller on where to drive until they arrived at a house, where Trevino hid the shotgun. Enriquez took the keys from Fuller and drove away; Gutierrez and Trevino took off walking; Fuller was told to stay at the house. Fuller stayed for an hour or two and then left; he got his car back the next day.

3.

Clarence Langston was shot just after midnight on July 30, 2011. Langston had been to the motel several times before the night of the shooting. Langston rode his bike to the motel that night looking for his wife and a friend. Langston was standing in the parking lot of the motel talking to a Black man when they were interrupted by two Hispanic men.

One of the Hispanic men asked Langston what he was doing in the parking lot, which started an argument. When it looked like there was going to be a problem, Langston left the parking lot on his bicycle. As he rode off, Langston heard someone yelling.

Langston rode around the corner to a friend's house and stopped and called his wife on his cell phone. As he did so, he saw someone with a gun jump out of the passenger side of a red SUV. Langston turned to run and dropped his phone. Langston heard a shotgun blast and then heard the shooter cock the gun and shoot again. Langston was near the back of the house when he was hit with pellets. Langston ran around the block and then back to the front of the house.

Just prior to the shooting, Langston's wife, Joyce, received a call from Langston asking her to meet him. She was in the vicinity and, when she turned onto Fourth Street, she saw her husband across the street. Joyce saw a small, red SUV pull up. A Hispanic man wearing a white shirt and jeans jumped out of the SUV with a shotgun; he had a haircut that left very little hair on the sides and slightly more on top.

The shooter was about three feet from Langston when Langston took off running. As Langston ran away, the shooter followed. Joyce started running but turned back around in time to see the shooter get back into the SUV, which then drove away. She heard a total of three gunshots being fired. After seeing the SUV drive away, Joyce went to the friend's house and called the police. Law enforcement arrived soon after.

Langston was taken to Kern Medical Center. The injuries to Langston were on his left side. Langston was interviewed by Police Officer Ryan Kroeker, who knew

4.

Langston from the past.  Kroeker found Langston on a gurney in one of the trauma rooms.  Langston told Kroeker he was at the motel when he began talking to a Hispanic male.  He described this male as being 30 to 40 years old and having a thick mustache, short hair, and a tattoo of the word "Bakers" across his back.  The conversation got heated and the two started arguing.  The man looked up to the balcony of one of the motel rooms and instructed the people there to "get the cuete," which Langston knew meant to get a gun.  Langston got on his bike and rode out of the motel parking lot.  Langston saw a red SUV approach him and someone from the vehicle shot at him.

Kroeker thought the description of the Hispanic man with a thick mustache, short hair, and a "Bakers" tattoo across his back fit Ramos, so he created a photographic lineup on his computer and showed it to Langston.  Kroeker asked Langston to identify anyone in the lineup who looked like the man who had instructed others to get the gun; Langston immediately pointed to Ramos's picture.  Langston was positive this was the same person.

Fuller was arrested on August 21, 2011, in connection with Langston's shooting.  He initially lied to officers, but later he identified Ramos as the person involved in the argument that led to the shooting.  Fuller was housed in the Lerdo Detention Facility, where he came into contact with Ramos numerous times.  Ultimately, Fuller pled no contest to being an accessory to attempted murder and testified under an immunity agreement.  Fuller previously had been convicted of first degree burglary in 2007.

After signing the immunity agreement, Fuller came into contact with Ramos.  Ramos told Fuller to lie and testify that Ramos was not involved; if Fuller did so, nothing would happen to his family.  After these encounters, Fuller was afraid for his family.

Schuetze initially lied to police at the motel, as well as later at the police station.  She lied because she liked Gutierrez and wanted to protect him.  She, however, did identify Enriquez from a photographic lineup.  She also told officers that after shots were fired, Ramos came back into the motel room.

5.

Trevino was arrested September 1, 2011, in connection with the shooting. Trevino identified Ramos, Gutierrez, and Enriquez from photographic lineups. Trevino gave a recorded statement to law enforcement, which was consistent with his trial testimony. Trevino was placed in protective custody. Trevino testified extensively at trial about the Sureños gang, including subsets known as the Varrio Wasco Rifa, Varrio Bakers, and Varrio Westside Shafters.

Langston testified at trial under an immunity agreement. Langston had suffered prior convictions for failing to register as a sex offender, felony sexual battery, assault with a firearm, and possession of a controlled substance for sale. Langston also had been a gang member when he was younger.

Officer Travis Harless testified as a gang expert. Harless testified about the Sureños gang and its various subsets. He also testified about the primary activities, gang culture, and predicate offenses of the Sureños. Harless opined Ramos was an active member of the Varrio Bakers subset of the Sureños, and Enriquez and Gutierrez were active members of the Varrio Westside Shafters subset of the Sureños. Harless opined that the shooting was done in association with the Sureños gang and it furthered the criminal conduct of the gang.

Gutierrez was convicted of attempted premeditated murder in count 1, assault with a firearm in count 2, and active participation in a criminal street gang in count 3. It also was found true as to count 1 that Gutierrez personally used and discharged a firearm and that the offense was committed in association with a criminal street gang. As to count 2, the gang enhancement and personal use of a firearm enhancement were found true. In a bifurcated trial, it was found true that Gutierrez suffered a prior strike conviction and had served three prior prison terms.

Enriquez was convicted of attempted premeditated murder in count 1, assault with a firearm in count 2, and the active participation in a criminal street gang offense in count 3. As to count 1 it was found true that a principal personally and intentionally discharged

6.

a firearm, and as to counts 1 and 2 it was found true that the offense was committed in association with a criminal street gang.  In a bifurcated proceeding, the trial court found true that Enriquez had suffered a prior strike conviction.

Ramos was convicted by a jury of the count 3 offense, active participation in a criminal street gang.  The jury was unable to reach a verdict on the count 1 attempted murder offense and the count 2 assault with a firearm offense, and the trial court declared a mistrial as to these two counts.  Thereafter, the trial court permitted the People to amend the information to allege a fourth count, making criminal threats, and prior conviction and prior prison term allegations.  Ramos pled no contest to count 4 and admitted the prior conviction and prior prison term enhancements as to counts 3 and 4.  In exchange, the People dismissed counts 1 and 2 and one enhancement appended to count 3.

## DISCUSSION

All three defendants challenge the trial court's denial of the *Batson/Wheeler* motion.  Enriquez contends the trial court abused its discretion when it denied a mistrial motion based upon comments made by a juror that tainted the venire.

Enriquez challenges the sufficiency of the evidence to establish (1) intent to kill and premeditation and deliberation on the attempted murder charge, (2) aiding and abetting attempted murder and assault with a firearm, (3) the gang enhancements, (4) the substantive gang offense, and (5) that his prior conviction constitutes a strike.  He also asserts instructional error in the giving of CALCRIM Nos. 337 and 3550 and in not instructing the jury to determine whether Schuetze was an accomplice, and, if so, her testimony had to be corroborated.  He contends the trial court erred by admitting lay opinion, allowing the gang expert (Harless) to opine that Enriquez was a gang member based on the current offenses, the use of booking statements to determine gang status, a contention Ramos joins, and in the lack of foundation for the gang expert's testimony.

7.

Enriquez also contends the prosecutor committed misconduct by vouching for witness testimony and referring to matters outside the record.

Ramos challenges the sufficiency of the evidence to support the substantive gang conviction and also contends, and Enriquez joins this contention, that he was denied due process because he was convicted on less than substantial evidence. Ramos additionally contends the gang registration requirement must be reversed because it was not part of the oral pronouncement of judgment.

Gutierrez contends there was insufficient evidence corroborating accomplice testimony, which requires reversal of all convictions, as well as insufficient evidence of intent to kill. He asserts ineffective assistance of counsel for failure to make objections to parts of Schuetze's testimony and move to strike it. Gutierrez also claims prosecutorial misconduct by misstating the law, arguing facts not in evidence, stating one accomplice can corroborate another, and vouching. He argues (1) instructional error, claiming the trial court erred by instructing that potential punishment of a witness could not be considered by a jury in assessing the truth of the witness's testimony, (2) CALCRIM No. 335 is incomplete, and (3) CALCRIM No. 302 lessens the prosecution's burden of proof. He also asserts cumulative error requires reversal.

Defendants have, in several instances, joined in issues raised by another defendant in this case. When doing so, counsel are obligated to provide particularized legal argument and citation to authority on each point raised. Counsel did not always fulfill this obligation in their briefing. If not so briefed, this court may treat the issue as waived. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364 (*Bryant*).) Counsel in future cases should be on notice that we will not be inclined to address issues in which a party has joined, absent particularized legal argument as to that party and citation to authority for each point raised. (*Ibid.*)

8.

Regardless, we have attempted to address the issues in which a defendant has joined with specificity as to that defendant. We, however, do not assume each defendant has standing to raise each contention. (*Bryant, supra,* 60 Cal.4th at pp. 363-364.)

**I.      *Batson/Wheeler***

At trial, defense counsel made a *Batson/Wheeler* motion, claiming the prosecutor engaged in racial discrimination when he exercised peremptory challenges against 10 of 11 potential Hispanic jurors. The trial court noted that the prosecutor had exercised peremptory challenges against 16 potential jurors, of which nine or 10 appeared to be Hispanic. The trial court found a prima facie case to be established, based largely upon the percentage of Hispanics challenged, and the prosecutor was asked to justify the peremptory challenges against Hispanics. The prosecutor gave reasons for the challenges and the trial court denied the motion.

On appeal, all three defendants contend the trial court erred in denying the *Batson/Wheeler* motion and challenge the prosecutor's exercise of peremptory challenges against these jurors. Gutierrez asserts the peremptory challenges to three female potential jurors, Nos. 2547226, 2723471, and 2510083, were improper. Enriquez and Ramos contend all the challenges to Hispanics were racially motivated. We disagree.

Federal law following *Batson* holds that exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws (*U.S. v. Martinez-Salazar* (2000) 528 U.S. 304, 315), and *Wheeler* holds that such conduct violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution (*Wheeler, supra*, 22 Cal.3d at pp. 276-277).

Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).) And although a party may exercise a peremptory challenge for any permissible reason or no reason at all (*Purkett v. Elem* (1995) 514 U.S. 765, 768 (*Purkett*); *People v. Jones* (1998)

17 Cal.4th 279, 294), "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (*Purkett,* at p. 768).

In evaluating a trial court's *Batson/Wheeler* ruling that a party has offered a race-neutral basis for subjecting particular prospective jurors to peremptory challenge, we are mindful that "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' [Citation.]" (*Purkett, supra,* 514 U.S. at p. 768; see, *Silva, supra*, 25 Cal.4th at pp. 385-386.) In a case in which deference is due, "The trial court's ruling on this issue is reviewed for substantial evidence. [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 971 (*McDermott*).)

On a *Batson/Wheeler* motion, "the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 549 (*Avila*).) At trial, the court and counsel follow a three-step constitutional analysis of peremptory challenges. First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, if the defendant makes out a prima facie case, the burden shifts to the prosecution to give an adequate explanation of the peremptory challenges by offering permissible neutral justifications. Third, if a neutral explanation is tendered, the trial court must decide whether the opponent of the peremptory challenges has proved purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168.)

Our duty after denial of a *Batson/Wheeler* motion without a finding of a prima facie case is to consider the entire voir dire record before us. Since *Batson/Wheeler* motions require a trial court's personal observations, we give considerable deference to the trial court's rulings. (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.) If the record suggests grounds on which the prosecutor reasonably might have challenged the prospective jurors at issue, our duty is to affirm. (*Ibid.*)

It is presumed that the prosecutor uses peremptory challenges in a constitutional manner. We defer to the trial court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) As long as the trial court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*Ibid.*)

The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific race- or group-neutral explanation related to the particular case being tried. (*People v. Fuentes* (1991) 54 Cal.3d 707, 718 (*Fuentes*); *People v. Johnson* (1989) 47 Cal.3d 1194, 1216 (*Johnson*); *People v. Hall* (1983) 35 Cal.3d 161, 167-168; see *Batson, supra,* 476 U.S. at pp. 97-98 & fn. 20.) The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice. (*People v. Montiel* (1993) 5 Cal.4th 877, 910, fn. 9; *Johnson*, at p. 1218.)

Here, race-neutral reasons for excusing the jurors are apparent from the record, and the prosecutor articulated race-neutral reasons for excusing each of the challenged jurors. That the prosecutor used many peremptory challenges to excuse Hispanics from the jury does not by itself establish a prima facie case. (See *People v. Box* (2000) 23 Cal.4th 1153, 1188-1189.)

When asked about Prospective Juror No. 2547226 (hereafter Juror 2547226), the prosecutor indicated he felt she might have trouble fulfilling her role as a juror and in understanding the role of a juror. When questioned during voir dire, Juror 2547226 indicated she was better at "listening than speaking my mind" and expressed that she did not know how many jurors had to agree to a verdict in a criminal case.

Peremptory challenges properly may be based on the demeanor of the prospective juror. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1203.) Juror 2547226 gave equivocal answers to some questions and expressed a lack of understanding of the jury process in a criminal case. The prosecutor's stated reasons reflect that, based upon Juror 2547226's equivocal answers to voir dire questions, he had doubts about her being able

to engage fully in the deliberative process and fulfill her role as a juror. A prosecutor may excuse a juror based upon "hunches," so long as the reason is not impermissible group bias. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 (*Gutierrez*).)

As to Prospective Juror No. 2723471 (hereafter Juror 2723471), the prosecutor indicated he exercised a peremptory challenge against her because she professed to being unaware of any gang activity occurring in Wasco, where she lived. This troubled the prosecutor because a principal witness, Trevino, was a member of a criminal street gang in Wasco and the prosecutor was concerned how Juror 2723471 would react to testimony from a Wasco gang member. This is a race-neutral reason that need not rise to the level of a challenge for cause. Moreover, it constitutes a valid reason, even if in a defendant's view the reason is trivial. (*People v. Arias* (1996) 13 Cal.4th 92, 136.)

Prospective Juror No. 2510083 (hereafter Juror 2510083) was excused by the prosecutor because she had claimed a hardship in serving, even though the trial court did not excuse her based on hardship. This constitutes a valid race-neutral reason for excusing the juror on a peremptory challenge. (See *People v. Barber* (1988) 200 Cal.App.3d 378, 398; *People v. Landry* (1996) 49 Cal.App.4th 785, 789.)

Prospective Juror No. 2632053 had participated in gang activity and had been around gangs in Idaho. She had a child fathered by a Sureños gang member, who had been found guilty of being an accessory to murder. This prospective juror's brother was a member of the Eastside Locos gang. The prosecutor explained that he exercised a peremptory challenge against this potential juror because her brother and the father of one of her children were gang members, both of whom had been convicted of gang-related crimes, even though the prospective juror was trying to change her life and stay away from the gang lifestyle. This explanation supports a race-neutral reason for exercising a peremptory challenge. (*People v. Williams* (1997) 16 Cal.4th 153, 191.)

Prospective Juror No. 2732073's husband had always been affiliated with a gang and had been convicted and incarcerated for offenses. Also, her father was a gang

12.

member. The prosecutor exercised a peremptory challenge against this prospective juror because of the gang connections. Again, this is a race-neutral reason for exercising a peremptory challenge. (*People v. Williams, supra,* 16 Cal.4th at p. 191.)

Prospective Juror No. 2408196 was married to a juvenile correctional officer and worked at Wasco State Prison as a records technician. She also had an uncle who had been a gang member and a cousin who was a former public defender. About two years earlier, her house had been burglarized and she was unhappy with how law enforcement had handled the matter. Although she had lived in Wasco her entire life, she claimed to be unaware of any gang activity occurring in Wasco. The prosecutor stated that he had excused this prospective juror because she had an uncle who was a member of a criminal street gang and she claimed to be unaware of any gang activity in Wasco, which the prosecutor thought might affect her view of Trevino's testimony. Once more, the gang connection constitutes a race-neutral reason for exercising a peremptory challenge. (*People v. Williams, supra,* 16 Cal.4th at p. 191.)

Prospective Juror No. 2647624 had two nephews who were serving prison sentences for gang-related crimes. She also had nieces who had sons that currently were involved in gang activity. Again, the prosecutor stated he exercised a peremptory challenge against this prospective juror because of the gang connections, which is a valid race-neutral reason. (*People v. Williams, supra,* 16 Cal.4th at p. 191.)

Prospective Juror No. 2291529 had a brother who had been killed in a bar fight 20 years earlier. He did not know if the investigation into his brother's death was handled appropriately. More recently, he had been the subject of a vehicle stop by an officer that escalated into six officers on the scene and it "got out of hand." He was unhappy about the vehicle stop and the way it had been handled by the officers. The prosecutor indicated he challenged this prospective juror because of the negative experience with law enforcement over the vehicle stop and he appeared to be more affected by this incident than his brother's death. A peremptory challenge based on a negative experience

with law enforcement is a proper race-neutral reason. (*People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

Prospective Juror No. 2468219 previously had been a juror in a criminal case that resulted in a hung jury; she also had sat on a civil jury that reached a verdict. In addition, her brother had been in trouble from time to time with the law and at the time of the trial her brother had violated probation and had a matter pending. When asked why he had exercised a peremptory against this prospective juror, the prosecutor noted the problems the prospective juror's brother had had with law enforcement and her sitting as a juror in a criminal trial that did not reach a verdict. Again, the prosecutor's explanations were race neutral. (*Wheeler, supra,* 22 Cal.3d at p. 277, fn. 18.)

Finally, Prospective Juror No. 2852410 had had two separate contacts with law enforcement that this juror viewed as negative experiences. Once again, a prospective juror's negative experiences with law enforcement can serve as a valid basis for a peremptory challenge. (*Gutierrez, supra,* 28 Cal.4th at p. 1125.)

Defendants wish us to engage in a comparative analysis regarding the prosecution's use, or failure to use, peremptory challenges on specific jurors. We do not engage in a comparative analysis of various juror responses to evaluate the good faith of the prosecutor's stated reasons for excusing a particular juror "because comparative analysis of jurors unrealistically ignores 'the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar.'" (*Fuentes, supra,* 54 Cal.3d at pp. 714-715, quoting *Johnson, supra,* 47 Cal.3d at pp. 1219, 1220.) "The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her. [Citation.]" (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17.)

"We accord great deference to a trial court's determination of the sufficiency of a prosecutor's explanations for exercising peremptory challenges. [Citations.]" (*People v.*

*Williams* (1997) 16 Cal.4th 635, 666.) The focus of a *Batson/Wheeler* analysis is on the subjective genuineness of the reason, not the objective reasonableness. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) The trial court noted the prosecutor had questioned all potential jurors in a similar fashion and had asked questions designed to elicit information regarding suitability to serve on a jury. The trial court analyzed the prosecutor's responses and the challenged jurors' responses to voir dire and found the prosecutor had race-neutral reasons for dismissing the challenged jurors. We conclude substantial record evidence supports the trial court's ruling. Therefore, we will not reverse the trial court's denial of the *Batson/Wheeler* motion.

## II.    Jury Venire Motion

During voir dire, Prospective Juror No. 2589394 stated she had been a correctional officer for 22 years and believed that street gangs and prison gangs were connected, that tattoos tell a story, and she was inclined to believe officers over other witnesses. Defense counsel argued that the comments from this juror had tainted the entire venire by expressing a connection between street gangs and prison gangs. Defense counsel moved to discharge the entire venire and begin voir dire with a new venire. The trial court denied the motion, stating, "I don't have an issue believing regardless of what [Prospective Juror No. 2589394] says, the jury wouldn't be able to follow the law in this particular case, even though, in fact" the comments might coincide with what the gang expert would offer as an opinion. All of the defendants excused this juror.

Enriquez and Ramos contend the trial court abused its discretion in denying the motion to discharge the entire venire. We disagree.

The California Supreme Court has held that dismissal of the entire venire is a drastic measure to be taken only in extreme cases. "We believe the trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required. Defendant cites no case, and we have found none, indicating that such a drastic

15.

remedy is appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks…. [D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*).)

Here, the trial court was within its discretion in denying the motion to excuse the entire venire. Instances with much more inflammatory comments have not warranted a discharge of the entire venire. (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1468-1473 [statements before venire about defendant being guilty because he was arrested and in court and prosecutor must have strong case]; *People v. Henderson* (1980) 107 Cal.App.3d 475, 493 [prospective juror revealed victim had been her psychotherapy patient]; *People v. Vernon* (1979) 89 Cal.App.3d 853, 865 [prospective juror stated defendant had been tried for raping her niece].)

As the trial court stated, there was no indication that the remarks by one juror would affect the venire and render them unable to follow the jury instructions that would be issued by the trial court. There was no error.

## III. Evidentiary Issues

Enriquez raises three evidentiary issues, in which Ramos has joined. First, they contend the trial court erred in allowing the gang expert to testify about the Westside Shafters subset of the Sureños because there was a lack of foundation for his testimony. Second, they claim it was error to allow the gang expert to opine that they were active members of the Sureños gang based upon their involvement in the current offenses. They also contend it was error to allow Trevino to offer a lay opinion on gangs. Not separately identified as an issue, but challenged by Ramos and Enriquez in their discussion of issues, is the admissibility of statements made during jail bookings regarding gang status.

16.

*Foundation Challenge*

At trial, Harless was allowed to testify as a gang expert. Harless was asked about the nature of the contact between the Varrio Bakers and the Westside Shafters gangs; defense counsel objected on the basis of foundation. The trial court overruled the objection. Harless was allowed to testify that the two gangs commit crimes together. Enriquez and Ramos contend this was error.

A trial court is given "'considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1377.) In *Singh*, a prosecution for fraud in staging accidents for the purpose of submitting false insurance claims, the appellate court affirmed a conviction based on expert testimony by law enforcement officers, even though they had not personally investigated the automobiles involved or the accident scenes, relying instead only on statements of witnesses and various reports. The appellate court noted, "Such an approach is not uncommon … when expert witnesses become involved at trial" and that deficiencies in the foundation of the expert's opinions properly were explored on cross-examination. (*Ibid.*)

In *People v. Hogan* (1982) 31 Cal.3d 815, the Supreme Court reversed a conviction for capital murder, in part because a criminalist was allowed to testify about blood spatter patterns when his experience and training in that area were "nonexistent." (*Id*. at p. 852.) He had never performed any laboratory analysis in any case; he had received no formal education or training; and his background on the subject consisted of reading a book on flight patterns of blood and viewing an exhibit prepared by "some unknown criminalist" that demonstrated patterns of human blood dropped from various heights and angles. (*Ibid.*) Finally, while he had observed bloodstains at many crime scenes, and had determined in his own mind whether they were spatters or "wipes," he had never verified his conclusions in any way.

In contrast, Harless had been assigned to the gang unit for over two years as of the time of the trial, and part of his duties included testifying as a gang expert at criminal trials in Kern County. He had received 90 hours of formalized training on gangs, with over half that training time focused on Hispanic gangs. Harless provided gang training to recruits at the police academy. He was a member of the Kern County Gang Investigators Association, an organization of various law enforcement agencies that share information about gangs and gang trends. Harless specialized in Black and Hispanic gangs and had testified as a gang expert 38 times prior to his testimony in defendants' trial.

Based upon the above credentials, the trial court allowed Harless to testify as an expert witness. "'""Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility."' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 322.) Here, sufficient training, education, and experience supported the trial court's decision to allow Harless to testify as an expert; any claimed deficiency of knowledge about the Westside Shafters subset of Sureños was appropriate for cross-examination and relevant to the weight that should be afforded the testimony.

### Active Gang Member Testimony

Enriquez and Ramos next contend the trial court violated their right to due process when it allowed Harless to testify they were active Sureños gang members based upon the current offenses. They argue that allowing Harless to testify that in his opinion they were active gang members constituted allowing Harless to testify to his opinion on how the case should be decided and was based on erroneous information.

Expert opinion testimony is admissible if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); see *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) The subject matter of the culture and habits of street gangs meets the criteria for the admissibility of expert opinion because such evidence is sufficiently beyond

common experience that the opinion of an expert would assist the trier of fact. (*Gardeley,* at p. 617.) Such areas include "testimony about the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], *motivation for a particular crime, generally retaliation or intimidation* [citations], *whether and how a crime was committed to benefit or promote a gang* [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, italics added, fns. omitted.)

A gang expert may testify concerning whether the defendant was a gang member or acted for the benefit of a gang, even though it is an ultimate factual issue for the jury to decide, because these are matters far beyond the common experience of the jury and justified expert testimony. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 508-510.) Consequently, there was no due process violation by allowing Harless to testify that in his opinion Enriquez and Ramos were current gang members.

We do not find support in the record for the claim that Harless relied upon inaccurate information or just the alleged participation in the current offenses in reaching this opinion. In opining that Enriquez was a gang member, Harless relied upon reports of prior law enforcement contacts with Enriquez, in which he admitted gang membership in the Varrio Westside Shafters gang. Harless also noted Enriquez's gang moniker and gang tattoos as informing his opinion. Although Harless also noted that the current offenses were committed in the company of and with the assistance of other Sureños gang members, and that Trevino testified Enriquez was a member of the Varrio Westside Shafters subset of the Sureños, this information clearly was not the only basis for Harless's opinion.

Harless also opined that Ramos was an active member of the Varrio Bakers subset of the Sureños. Again, the alleged participation in the current offenses was not the sole

basis for the opinion. In prior contacts with law enforcement, Ramos had acknowledged gang membership, had used a gang moniker, wore gang indicia, and was in the company of other gang members. Ramos had claimed Sureños affiliation multiple times when booked into jail.

There was no error in allowing expert opinion that Ramos and Enriquez were members of the Varrio Bakers and Varrio Westside Shafters, respectively.

### Booking Statements

Enriquez and Ramos challenge the admissibility and use of their statements during jail bookings regarding gang affiliation. To assure protection of the Fifth Amendment privilege against self-incrimination, a suspect may not be subjected to an interrogation while in custody unless he or she previously has been advised of and has knowingly and intelligently waived his or her rights to silence, to the presence of an attorney, and to appointed counsel if he or she is indigent. Statements made in violation of *Miranda*[1] are inadmissible to establish guilt. (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1480-1481.)

 In *Pennsylvania v. Muniz* (1990) 496 U.S. 582, a four-justice plurality recognized "a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the '"biographical data necessary to complete booking or pretrial services."'" (*Id.* at p. 601 (plur. opn. of Brennan, J.).) Questioning about possible gang affiliations for housing purposes is now a routine question that is asked at booking. "The routine booking interview is an indispensable procedure in the efficient administration of justice." (*People v. Quiroga* (1993) 16 Cal.App.4th 961, 971.)

Questioning about gang affiliations is a security question that must be asked to facilitate safe housing in the jails. Both Enriquez and Ramos answered booking

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436.

questions on gang affiliation when booked into jail on charges unrelated to the current offenses.

Furthermore, section 1220 of the Evidence Code provides an exception to the hearsay rule for statements that are offered against the declarant in an action to which he or she is a party. The statements of gang affiliation made at jail bookings are admissible under this exception. As a statutory exception to the hearsay rule, an admission is considered reliable. (*People v. Earnest* (1975) 53 Cal.App.3d 734, 741.)

It was not error to permit Harless to rely upon statements of gang affiliation made at jail bookings.

### Trevino Lay Opinion

Trevino testified to (1) the gang subsets of the three defendants, (2) the subsets being part of the Sureños, (3) the subsets of Sureños in Kern County of which he was aware, (4) the connection between Sureños inside and outside of prison, (5) the structure and hierarchy of the Sureños, (6) the use of gang monikers, (7) the induction of gang members, and (8) the activity of gang members after induction. Enriquez, joined by Ramos, argues that the trial court violated his due process rights by allowing Trevino to offer a lay opinion on matters of which he had no personal knowledge. Again, we find no support for this contention in the record.

At the time of the offenses, Trevino was a member of the Varrio Wasco Rifa, a subset of the Sureños. He had been inducted into the gang and a member for 20 years and during that time had committed offenses for the benefit of the gang. Trevino had been given authority and influence over activities of gang members in his neighborhood. Also during this time, Trevino came into contact with members of other subsets of the Sureños and committed crimes with members of other subsets. While in prison, Trevino had contact with other Sureños about criminal activity occurring in and out of the prison. Trevino had spoken with Enriquez, Gutierrez, and Ramos, and each identified his gang subset to Trevino.

21.

Enriquez and Ramos also claim that Trevino was not a member of the Mexican Mafia and therefore could not testify to its hierarchy. We disagree. Trevino, as a 20-year member, could testify to his understanding of the hierarchy of the Sureños and the hierarchy involved the Mexican Mafia. The claim that Trevino was from Wasco, an area geographically separate from Bakersfield and Shafter, and therefore somehow not able to offer a lay opinion, also fails. Trevino could, and did, testify about matters to which he had personal knowledge. Any contention that his testimony should not be credited because of his location in Wasco goes to the weight, not admissibility. (*Medina, supra,* 51 Cal.3d at p. 887.)

The admissibility of lay opinion is reviewed for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 453.) Here, there was no abuse of discretion.

## IV.    Insufficiency of the Evidence

All three defendants raise challenges to the sufficiency of the evidence. Enriquez and Gutierrez challenge the sufficiency of the evidence of intent to kill. Enriquez also challenges the sufficiency of the evidence of premeditation and deliberation, aiding and abetting attempted murder, aiding and abetting assault with a firearm, the gang enhancements, and that his prior conviction constituted a strike offense. Enriquez and Ramos challenge the sufficiency of the evidence supporting the substantive gang offense and contend they were denied due process because they were convicted on less than substantial evidence. Gutierrez contends there was insufficient corroboration of accomplice testimony; consequently, all the convictions must be reversed.

We disagree with all these contentions.

### *Standard of Review*

The standards that govern review of the sufficiency of the evidence supporting convictions also apply to enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) The standard of review is familiar -- """"When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most

favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 848-849; see *People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1456-1457.)

This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"'It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] "Issues of fact and credibility are questions for the trial court." [Citations.] It is not an appellate court's function, in short, to redetermine the facts.'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140, quoting *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199-200.)

The defendant has the burden of showing there is no evidence of a sufficiently substantial nature to support the verdict. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

*Accomplice Testimony*

Gutierrez and Enrique contend the evidence was insufficient to corroborate the testimony of accomplices Fuller and Trevino.

Adequate corroboration of an accomplice's testimony need not in itself be sufficient to convict the defendant; it may be slight and entitled to little consideration when standing alone. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 (*Rodrigues*); *People v. Douglas* (1990) 50 Cal.3d 468, 507 (*Douglas*).) It need only "*tend*[] to connect the defendant with the crime so that the jury may be satisfied that the accomplice is telling the truth." (*Douglas*, at p. 506, fn. omitted.) The corroborating evidence may be circumstantial and may consist of a defendant's conduct or statements. (*Id.* at p. 507.) It thus may be evidence that shows a consciousness of guilt. (*People v. Hurd* (1970) 5 Cal.App.3d 865, 875.)

The corroborating evidence must tend to connect the defendant to the crime, but it neither has to establish every element of the offense nor corroborate all of the accomplice's testimony. (*People v. Heishman* (1988) 45 Cal.3d 147, 164-165 (*Heishman*).) Although the corroborating evidence need only tend to connect the defendant to the crime, it must do more than raise a mere conjecture or suspicion of guilt. (*People v. Szeto* (1981) 29 Cal.3d 20, 27.) "[I]t is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.]" (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

"'A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice.'" (*People v. Williams, supra,* 16 Cal.4th at p. 680; accord, *Avila, supra,* 38 Cal.4th at p. 563 ["Defendant's initial attempt to conceal from the police his involvement in the activities culminating in the murders implied consciousness of guilt constituting corroborative evidence."].) False and contradictory statements of a defendant regarding the charge are material corroborating

evidence.  (*People v. Santo* (1954) 43 Cal.2d 319, 327; *People v. Taylor* (1924) 70 Cal.App. 239, 244; *People v. McLean* (1890) 84 Cal. 480, 481 [accomplice testimony sufficiently corroborated by evidence the defendant "made contradictory statements concerning his whereabouts on the night of the fire" and "took measures to get the accomplice to leave that part of the country"].)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*); *McDermott, supra,* 28 Cal.4th at p. 986; see *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.)

Gutierrez and Enriquez claim there that was insufficient corroborating evidence placing them at the scene of the crime, that Gutierrez was the shooter, and that Enriquez was present in the SUV at the time of the shooting.

Schuetze testified Gutierrez was in her apartment and had gone with her and others in Fuller's SUV to the motel to pick up drugs.  Schuetze saw the shotgun in the SUV as they drove to the motel.  Gutierrez gave her shotgun shells to hold.  At the motel, Schuetze heard Ramos and Langston arguing.  She saw the SUV leave; Gutierrez and Enriquez no longer were at the motel.  She heard gunshots shortly thereafter.  Langston identified the person he was arguing with as Ramos.  Langston also stated that he was pursued and shot by someone riding in the SUV.  This evidence, taken together, was sufficient to "tend to connect" Gutierrez and Enriquez to the offenses; it need not be sufficient by itself to warrant a conviction.  (*Rodrigues, supra,* 8 Cal.4th at p. 1128; *Douglas*, *supra*, 50 Cal.3d at p. 506.)

While Gutierrez especially attempts to assert that there is a lack of corroborating evidence for specific facts, it is well established that independent evidence need not corroborate every fact.  (*Heishman, supra,* 45 Cal.3d at pp. 164-165.)  The jury's

25.

determination on the issue of corroboration is binding on this court. (*Abilez, supra,* 41 Cal.4th at p. 505.)

### Intent to Kill

Enriquez and Gutierrez both challenge the sufficiency of the evidence of intent to kill. Gutierrez was the shooter; Enriquez was convicted based upon an aiding and abetting theory.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*).) Enriquez and Gutierrez contend the evidence was insufficient to establish intent to kill.

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.…'" (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).)

"[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although … where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill. [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 742.)

Gutierrez claims the evidence of intent to kill is insufficient because his first shot missed Langston and the second shot was with a shell containing birdshot, which Gutierrez contends could not have killed Langston unless he was shot at close range.

26.

We summarily dispense with Gutierrez's contention that there was no intent to kill because his first shot missed Langston. That the bullet misses its mark or fails to prove lethal is not dispositive—the "very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"'" is sufficient to support an inference of intent to kill. (*Smith*, *supra*, 37 Cal.4th at p. 742.) Missing his target merely demonstrates that Gutierrez may have been a poor shot, not that he lacked intent to kill.

Gutierrez's claim that he lacked an intent to kill because his second shot was with a shell full of buckshot also is rejected. Gutierrez fired at least three shots while pursuing Langston, who was attempting to get away; only one shot struck Langston. The act of firing multiple shots while pursuing Langston as he attempted to get away clearly supports an inference that Gutierrez was attempting to kill Langston. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946 (*Lashley*).) Again, Gutierrez's poor marksmanship and inability to get closer to Langston as Langston was fleeing do not compel a conclusion that Gutierrez lacked intent to kill. (*Ibid.*)

As for Enriquez, "to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*Lee, supra,* 31 Cal.4th at p. 624.) Enriquez raises a similar contention as Gutierrez in asserting lack of an intent to kill, specifically, that shooting at someone with birdshot could not have resulted in the person's death. As we noted previously, however, just because a shot misses the intended victim, or is not fatal, does not, as a matter of law, mandate a conclusion there was no intent to kill. (*Smith*, *supra*, 37 Cal.4th at p. 742; *Lashley, supra,* 1 Cal.App.4th at pp. 945-946.)

The case of *People v. Campbell* (1994) 25 Cal.App.4th 402 is instructive. In *Campbell,* codefendant Smith's convictions for aiding and abetting an attempted robbery and attempted murder were upheld based on his presence during the robbery and his

27.

postoffense conduct. During the robbery, codefendant Campbell produced a handgun and aimed it at the victim. On appeal, Smith claimed the evidence showed only that he was present when Campbell attempted to rob the victim. This contention was decisively rejected. The trial court pointed out that Smith was not surprised by Campbell's conduct or afraid to interfere with it. The trial court found that "[t]heir concerted action reasonably implies a common purpose" and that the jury could find Smith's act of standing in front of the victims was intended "to intimidate and block them, divert suspicion, and watch out for others who might approach. Such conduct is a textbook example of aiding and abetting." (*Id*. at p. 409.)

That same reasoning applies here. Enriquez and Gutierrez watched as Ramos and Langston argued. Ramos called out to them; both men responded and went to support Ramos. Ramos made eye contact with Enriquez and told him he was going to get a gun. Enriquez, Trevino, and Gutierrez got into the SUV and Enriquez told the others that Ramos was going to get a gun. Gutierrez responded that he already had a gun with him in the SUV.

When the SUV stopped, it was Enriquez who pointed out Langston's location to Gutierrez. Gutierrez hopped out of the SUV saying, "Let's take care of this fool right now." Gutierrez chased Langston while firing three shots at him, stopped to pick up the expended shell casings, and then got back into the SUV. After the shooting, it was Enriquez who drove the SUV away from the site of the shooting.

We conclude there was sufficient evidence of defendant Enriquez's aiding and abetting murder.

### *Premeditation and Deliberation*

Enriquez argues there was insufficient evidence to support the premeditation and deliberation finding. We disagree.

In assessing the evidence for premeditation and deliberation, "'The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment

28.

and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[d] an intent to kill, is not such deliberation and premeditation ....'" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) "'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ....'" (*People v. Velasquez* (1980) 26 Cal.3d 425, 435.)

Here, the evidence of premeditation and deliberation is the same as that showing an intent to kill. After Ramos had an altercation with Langston and told Enriquez he was going to get a gun, Enriquez rounded up the other members of his gang that were present and got into the SUV. Enriquez then informed the others that Ramos had gone to fetch a gun; Gutierrez responded by stating he had a gun in the SUV. Enriquez went with the others in the SUV to hunt down Langston and then pointed out Langston to the others when Enriquez spotted him on the street. Gutierrez pursued Langston with the shotgun, firing at Langston three times from a distance of between three and 20 feet.

Enriquez had more than ample time to deliberate on his actions. This was not a rash or sudden action that happened rapidly. It took time to locate Langston, time during which Enriquez had an opportunity to reflect on and consider his actions. In light of these facts, there was substantial evidence upon which a jury reasonably could have found the attempted murder to be deliberate and premeditated.

### *Assault with a Firearm*

Enriquez was convicted of aiding and abetting assault with a firearm and he contends the evidence was insufficient to sustain the conviction. This argument is based on the premise there was insufficient corroboration of accomplice testimony to sustain the conviction. As we previously concluded, the accomplice testimony was adequately corroborated by Schuetze, Harless, and others. Consequently, this contention is rejected.

*Substantive Gang Offense*

Enriquez and Ramos contend the evidence was insufficient to sustain the conviction for the substantive gang offense under Penal Code section 186.22, subdivision (a).[2] We disagree.

The section 186.22, subdivision (a) substantive gang offense is comprised of three elements: (1) active participation in a criminal street gang; (2) knowledge that the gang's members have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) In *People v. Rodriguez* (2012) 55 Cal.4th 1125, the California Supreme Court clarified that in order to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help members of his or her gang commit felonious criminal conduct. (*Id.* at p. 1132.) "The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid.*)

Here, Enriquez contends there was insufficient evidence the Varrio Westside Shafters was a "criminal street gang" and that he actively participated in the gang. Ramos contends the evidence was insufficient on all three elements of the offense.

In *Albillar, supra,* 51 Cal.4th 47, the California Supreme Court rejected the argument that the offense defined by section 186.22, subdivision (a) includes "an unwritten requirement that the 'felonious criminal conduct' that is promoted, furthered, or assisted be gang related[.]" (*Albillar*, at p. 51.)

The court explained: "The gravamen of the substantive offense set forth in section 186.22(a) is active participation in a criminal street gang.… [T]he phrase 'actively participates' reflects the Legislature's recognition that criminal liability attaching to

---

[2]All further statutory references are to the Penal Code unless otherwise noted.

30.

membership in a criminal organization must be founded on concepts of personal guilt required by due process: 'a person convicted for active membership in a criminal organization must entertain "guilty knowledge and intent" of the organization's criminal purposes.' [Citation.] Accordingly, the Legislature determined that the elements of the gang offense are (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.] All three elements can be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related." (*Albillar*, *supra*, 51 Cal.4th at pp. 55-56.)

Enriquez and Ramos claim there was a lack of evidence establishing Varrio Westside Shafters as a criminal street gang. Much of the argument from Enriquez and Ramos centers on the fact that testimony about the activities of the gang often referred to the Sureños gang, not specifically the Varrio Westside Shafters gang. Evidence establishing a criminal street gang's activities, however, "need not necessarily be specific to a particular local street gang as opposed to the larger organization. [Citations.]" (*People v. Williams* (2008) 167 Cal.App.4th 983, 987; see, e.g., *People v. Hawthorne* (1992) 4 Cal.4th 43, 53.)

The People argued at trial that the criminal street gang at issue was the Sureños gang, of which Varrio Westside Shafters and Varrio Bakers were subsets. Harless testified as a gang expert that the primary activities of the Sureños gang included murders, assaults, shootings, carjacking, auto theft, burglary, and narcotics offenses. The primary activities to which Harless testified fall squarely within the offenses enumerated in section 186.22, subdivision (f). Harless also testified that the Sureños were involved in an ongoing pattern of criminal activity. Harless opined that both Varrio Bakers and

Varrio Westside Shafters were part of the Sureños gang. Trevino also testified that Varrio Bakers and Varrio Westside Shafters were part of the Sureños gang.

The evidence establishing the primary activities of the Sureños, and that Varrio Bakers and Varrio Westside Shafters were part of the Sureños gang, was sufficient to establish the primary activities and predicate offenses of the overarching criminal street gang to which Ramos and Enriquez belonged.

Ramos and Enriquez also contend there was insufficient evidence they actively participated in the gang. Active participation in the gang is involvement that is more than nominal or passive. (*People v. Castenada* (2000) 23 Cal.4th 743, 747.)

As for Ramos, on August 18 and September 3, 2008, he acknowledged being a member of the Varrio Bakers. On five different occasions between March 30, 1997, and July 31, 2011, including his arrest for the current offenses, Ramos claimed he was a member of the Sureños gang and needed to be kept away from rival Norteños when booked into jail. Harless testified that Ramos was an active member of the Varrio Bakers subset of the Sureños. Ramos sported gang tattoos and had a gang moniker. Ramos, on more than one occasion, was in the company of another Varrio Bakers gang member. This evidence was sufficient to establish that Ramos's involvement was more than nominal or passive and that he was an active gang member. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

The evidence similarly establishes that Enriquez was an active member of the gang. Harless testified Enriquez was an active member of the gang. Enriquez was in the company of Varrio Westside Shafters gang members during prior contacts with law enforcement and had a gang moniker. On five occasions between September 23, 2010, and August 6, 2011, Enriquez was booked into the jail and asked to be kept away from Norteños. He acknowledged being a member of the Varrio Westside Shafters subset of the Sureños. Enriquez had multiple gang tattoos on his head, neck, face, and hands. This was sufficient evidence to establish that Enriquez's involvement with the gang was more

32.

than nominal or passive and he was an active member of the gang.  (*People v. Martinez, supra,* 158 Cal.App.4th at p. 1331.)

The willful promotion element also was supported by sufficient evidence.  Ramos was involved in an altercation with Langston and called out to his "Southside homies" to assist him; Ramos also called out for his fellow gang members to get a gun.  Enriquez complied with Ramos's call for "homies" to assist him.  It was Enriquez who then had his fellow gang members get into the SUV to follow Langston, pointed out Langston so he could be shot, and then drove the SUV from the crime scene.

The shooting of Langston, who had "disrespected" a Sureños gang member, furthered the purposes of the gang by showing the level of violence the gang would use, increasing the gang's status.  Further, gang members gain respect and increase their status within the gang by committing crimes of violence.  The shooting creates intimidation and fear and deters others from interfering with the gang's activities.

Finally, Ramos challenges the sufficiency of the evidence demonstrating he had any knowledge that the gang's members had engaged in a pattern of criminal activity.  Circumstantial evidence establishes that Ramos had the requisite knowledge.  (*People v. Lewis* (2001) 26 Cal.4th 334, 379.)

Harless testified that members of gangs know about the ongoing criminal activities of the gang.  Ramos was a "shot-caller" and had an elevated status in the gang.  Trevino testified that when a gang member commits a crime, he wants other gang members to know about it because it increases the person's status within the gang.  Trevino also testified that a member works his way up in the gang by committing crimes.  From 1997 until his arrest for the current offenses, Ramos claimed membership in the Varrio Bakers subset of the Sureños.  This information, taken together, was sufficient circumstantial evidence establishing that Ramos had knowledge the gang's members engaged in a pattern of criminal activity.  (*People v. Lewis, supra,* 26 Cal.4th at p. 379.)

*Gang Enhancement*

Enriquez argues the evidence was insufficient to support the gang enhancement set forth in section 186.22, subdivision (b). Section 186.22, subdivision (b) has two prongs: (1) conviction of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, and (2) the defendant committed the crime with the specific intent to promote, further, or assist in any criminal conduct by gang members.

Enriquez repeats the same argument as with the gang offense -- that the evidence was insufficient because the primary activities and predicate offenses testified to at trial concerned the Sureños gang, not specifically the Varrio Westside Shafters subset. As discussed, *ante,* evidence establishing a criminal street gang's activities, however, "need not necessarily be specific to a local street gang as opposed to the larger organization." (*People v. Williams, supra,* 167 Cal.App.4th at p. 987.)

The second prong is satisfied if "substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) The second prong is established because Enriquez committed the offenses with other known members of the Sureños gang, including Ramos and Gutierrez.

*Strike Prior*

Enriquez contends the evidence was insufficient to support the finding that his prior conviction for possession of a loaded firearm in public by an active gang member was a serious felony and strike offense. We disagree.

A prior conviction qualifies as a strike if it is for an offense "defined in subdivision (c) of Section 667.5 as a violent felony or . . . defined in subdivision (c) of Section 1192.7 as a serious felony in this state." (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1).) The list of serious felonies set forth in section 1192.7, subdivision (c)

34.

includes any felony offense that would also constitute a felony violation of section 186.22.  (§ 1192.7, subd. (c)(28).)  The California Supreme Court determined that section 1192.7, subdivision (c)(28) includes the substantive gang offense and any felony committed for the benefit of a criminal street gang as defined in section 186.22, subdivision (b)(1).  (*People v. Briceno* (2004) 34 Cal.4th 451, 456, 464.)

Enriquez pled no contest to a violation of former section 12031, subdivision (a)(2)(C) in 2010.[3]  Effective January 1, 2012, former section 12031 was repealed and section 25850 became operative; it was a nonsubstantive reorganization of deadly weapons statutes.  (Stats. 2010, ch. 711, §§ 4, 6; *People v. Elliott* (2012) 53 Cal.4th 535, 587, fn. 7.)  Former Section 12031, subdivision (a)(2)(C) made it a felony for a criminal street gang member to carry a loaded firearm in public.

Section 1016 explicitly provides that the legal effect of a no contest plea to a crime punishable as a felony is the same for all purposes as a plea of guilty.  (*People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1506.)  Thus, Enriquez's plea constitutes "a judicial admission of every element of the offense charged."  (*People v. Chadd* (1981) 28 Cal.3d 739, 748 (*Chadd*).)

In *People v. Robles* (2000) 23 Cal.4th 1106 (*Robles*), the California Supreme Court determined that the reference in former section 12031, subdivision (a)(2)(C) to active participation in a criminal street gang referred to the substantive gang offense set forth in section 186.22, subdivision (a) and encompassed all elements of the substantive gang offense.  (*Robles,* at p. 1115.)  When a defendant satisfied the elements of the section 186.22, subdivision (a) offense and carried a loaded firearm in public, the offense was a felony.  (*Robles,* at p. 1115.)

---

[3] Former section 12031 was first adopted in 1967 and last amended in 2009 before being repealed and recodified.  (Stats. 1967, ch. 960, § 1; Stats. 2009, ch. 288, § 1.)

Here, in 2010 Enriquez pled no contest, the equivalent of a guilty plea, to the offense set forth in former section 12031, subdivision (a)(2)(C), 10 years after *Robles* was published and six years after *Briceno* was published. Enriquez's plea constitutes "a judicial admission of every element of the offense charged." (*Chadd, supra,* 28 Cal.3d at p. 748.) Every element of the offense charged included all the elements of the substantive gang offense under section 186.22, subdivision (a). (*Robles, supra,* 23 Cal.4th at p. 1115.) At the time of his plea, Enriquez was advised by the trial court of the consequences of pleading to a serious felony. Enriquez cannot now claim that his plea constituted an admission of only a portion of the elements of the substantive gang offense.

*Conclusion*

The test on appeal for whether there was sufficient evidence to uphold a conviction is whether there was substantial evidence to support the conclusion of the trier of fact -- it is not whether guilt was established beyond a reasonable doubt. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371-1372.) Here, there was sufficient evidence and defendants' challenges to the sufficiency of the evidence fail.

## V. Instructional Issues

Gutierrez and Enriquez raise multiple instructional issues; Ramos has joined in two of these issues. Gutierrez contends the trial court made several instructional errors, including (1) CALCRIM No. 302 lessens the prosecution's burden of proof; (2) CALCRIM No. 335 fails to instruct the jury adequately on accomplice testimony; (3) by allowing slight evidence to corroborate accomplice testimony, CALCRIM No. 335 undermines the presumption of innocence; and (4) error to instruct the jury that potential punishment being faced by a witness could not be considered in assessing the witness's credibility. Enriquez, joined by Ramos, contends it was error to instruct with CALCRIM Nos. 337 and 3550 and failure to instruct the jury that Schuetze was an accomplice as a matter of law and that her testimony had to be corroborated independently.

*Standard of Review*

In considering a claim of instructional error we must first ascertain what the relevant law provides and then determine what meaning the instruction conveys. "The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) We evaluate whether an instruction is misleading by reviewing the jury charge as a whole. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237.) Instructions are not considered in isolation. (*People v. Holt* (1997) 15 Cal.4th 619, 677.) ""'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."' [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 (*Musselwhite*); see *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061.) "An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. [Citation.]" (*Campos,* at p. 1237.)

In reviewing a claim of instructional error, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions that are given. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) Juries are presumed to follow the trial court's instructions, unless the record affirmatively indicates otherwise. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83 (*Coffman and Marlow*).) When considering a claim that the trial court improperly instructed the jury, a reviewing court must determine whether there is a reasonable likelihood the jury construed or applied the instructions in an objectionable fashion. (*People v. Osband* (1996) 13 Cal.4th 622, 685-686.) We review all instructions given, not just the instruction complained of, to determine whether the jury charge as a whole is correct. (*Musselwhite*, *supra*, 17 Cal.4th at p. 1249.)

37.

*CALCRIM No. 302*

Gutierrez contends CALCRIM No. 302 lessens the prosecution's burden of proof. CALCRIM No. 302 reads:

> "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of a greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

Gutierrez claims that when applied to prosecution evidence, the instruction is correct; but when applied to defense evidence and testimony, the jury may interpret the instruction as requiring believable and convincing proof before accepting defense testimony, rather than accepting exculpatory evidence that "possibly" could be true.

First, Gutierrez has forfeited this argument by not objecting to the instruction in the trial court or requesting a clarifying instruction. If the defendant believes that an instruction is incomplete or needs elaboration, then he or she is obligated to request an additional or clarifying instruction. (*People v. Maury* (2003) 30 Cal.4th 342, 426.) "The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151 (*Rundle*).)

Second, Gutierrez's interpretation of the language of CALCRIM No. 302 previously has been addressed, and rejected, in *People v. Anderson* (2007) 152 Cal.App.4th 919, 938-940. As the appellate court noted in *Anderson*, not only is the argument based on a misreading of the instruction, but it ignores the fact the jury receives other instructions on evaluating testimony of witnesses. We presume the jury understood, correlated, and followed the instructions. (*People v. Sanchez* (2001) 26

38.

Cal.4th 834, 852 [jurors "are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

Consequently, not only has Gutierrez forfeited this issue by failing to seek a clarifying instruction in the trial court, it fails on the merits.

### CALCRIM No. 335

Gutierrez next contends that CALCRIM No. 335 undermines the presumption of innocence and stated a lesser burden for the prosecution than proof beyond a reasonable doubt by permitting the jury to find that accomplice evidence was corroborated by "slight evidence." Again, Gutierrez failed to object to this instruction, or request any clarifying language, in the trial court. As such, he has forfeited any claim of error. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.)

Moreover, the statement that accomplice testimony need be corroborated by only slight evidence is a correct statement of the law. (§ 1111; *People v. Zapien* (1993) 4 Cal.4th 929, 982.) The corroboration requirement of section 1111 is a collateral factual issue, not an element of the charged offense that must be proven beyond a reasonable doubt. (*People v. Frye* (1998) 18 Cal.4th 894, 967 (*Frye*).)

The California Supreme Court in *Richardson, supra,* 43 Cal.4th at page 1024 reaffirmed the slight evidence standard. Neither *Richardson* nor any other California Supreme Court case of which we are aware holds that corroboration by slight evidence reduces the prosecution's burden of proof. We are bound by the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Gutierrez also argues CALCRIM No. 335 fails to instruct the jury that accomplice testimony must connect the defendant to the crime in such a way that the jury is satisfied the accomplice is telling the truth. Gutierrez forfeited this contention by not objecting in the trial court and requesting any clarifying or modifying language. (*Rundle, supra,* 43 Cal.4th at p. 151.)

39.

Additionally, section 1111 does not explicitly contain the requirement that accomplice testimony must connect the defendant to the crime in such a way that the jury is satisfied the accomplice is telling the truth. Section 1111 states, in part, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."

Moreover, the jury was instructed, through CALCRIM No. 226, on the standards for judging the credibility or believability of a witness and deciding whether to believe all, part, or none of a witness's testimony. CALCRIM No. 226 has been found to be a correct statement of law on assessing credibility of witnesses. (*People v. Warner* (2008) 166 Cal.App.4th 653, 656-659.) We presume the jury understood and correlated CALCRIM Nos. 226 and 335. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 83.)

### *CALCRIM Nos. 337 and 3550*

During closing argument, counsel for Ramos argued that Fuller was a "thief" and "drug addict liar" who "weaseled his way out of a life sentence" and instead received six years. At this point, the prosecution objected and asked that the jury not consider punishment and consequences. The trial court then told the jury "you will be instructed" that "you're not to consider any potential consequences." The trial court went on to say that the testimony was that when Fuller entered his plea, he was "looking at a life sentence." The trial court again stated that "you will be instructed you're not to consider consequences, punishment in relative to making your decision."

Gutierrez and Enriquez, joined by Ramos, contend the trial court erred by so instructing the jury. They assert these instructions told the jury not to consider potential or actual penal consequences facing prosecution witnesses when assessing the witness's credibility. We disagree.

The jury was instructed pursuant to CALCRIM No. 337 that when Fuller and Trevino testified, "they were in custody, the fact that a witness is in custody does not by

40.

itself make a witness more or less believable. You are to evaluate the witness' testimony according to the instructions I have given you." The jury also was instructed with CALCRIM No. 3550, predeliberation instructions, which includes the statement, "You must reach your verdict without any consideration of punishment." However, the trial court also instructed the jury with CALCRIM No. 226, which specifically states that among the factors for a jury to consider in assessing a witness's credibility is whether the witness was promised immunity or leniency in exchange for his or her testimony.

A jury "can consider the differences between the potential penalties faced and the actual penalties received by accomplices in assessing their credibility." (*People v. Jones* (2003) 30 Cal.4th 1084, 1114.) CALCRIM No. 3550, however, clearly applies to the jury's deliberation of the charges against a defendant; the jury does not return a verdict except as against a defendant. CALCRIM No. 226 clearly instructed the jury it could consider promises of immunity or leniency in determining whether to believe testimony from a witness. Furthermore, the comments from the trial court to the jury were that it would be instructed regarding consideration of punishment and consequences. We presume the jury understood and correlated CALCRIM Nos. 226 and 3550. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 83.)

Although the trial court's comments were somewhat inarticulate, we do not view them as erroneously instructing the jury it could not consider potential penal consequences to Fuller or Trevino in assessing the credibility of these witnesses. The trial court apparently was trying to inform the jury that it would be instructed it could not consider potential punishment in reaching a verdict on the guilt of the three defendants. This was in direct response to Ramos's counsel pointing out that potentially Fuller, and therefore defendants, were facing life in prison.

In light of the trial court's comments to the jury that it would be instructed on this issue, combined with the instructions given that correctly informed the jury it could consider immunity or leniency in assessing witness credibility, a reasonable juror would

41.

have understood that he or she was not barred from considering the potential punishment faced by Fuller or Trevino, and the punishment they actually received, in assessing the credibility of their testimony. (*People v. Jones, supra,* 30 Cal.4th at p. 1114.)

### *Accomplice as a Matter of Law*

In the trial court, Gutierrez, joined by Enriquez, requested the trial court instruct the jury that Schuetze was an accomplice as a matter of law and that her testimony must be corroborated independently; the prosecution objected. The trial court declined the request.

On appeal, Enriquez, joined by Ramos, contends the trial court erred by not instructing the jury that it had to determine if Schuetze was an accomplice, and, if so, that her testimony must be corroborated. No request was made for such an instruction, but Enriquez and Ramos argue the trial court had a sua sponte duty to so instruct.

An accomplice is a person "liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) The test of whether a witness is an accomplice is a factual, not legal, question. (*People v. Fauber* (1992) 2 Cal.4th 792, 834 [whether person is accomplice is question of fact for jury unless there is no dispute as to either facts or inferences to be drawn]; *People v. Sully* (1991) 53 Cal.3d 1195, 1227-1228 [same].) Although the burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963), "'[w]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration. [Citation.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)

There is no evidence in the record from which a jury could have concluded that Schuetze was an accomplice. There is no evidence Schuetze (1) had any knowledge defendants were going to shoot Langston, (2) encouraged the shooting of Langston, or (3) was present at the shooting of Langston. At most, Schuetze was present in the car

when defendants drove to a motel and she knew a shotgun and shells were in the vehicle. This knowledge, however, was insufficient to elevate her to the level of an accomplice. (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.) """"An accomplice must have "'guilty knowledge and intent with regard to the commission of the crime."'"" [Citation.]" (*Id.* at p. 1224.) As the trial court noted, the evidence was not even sufficient to consider Schuetze to be an accessory. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 103.)

## VI. Claims of Prosecutorial Misconduct

Enriquez and Gutierrez assert the prosecutor committed misconduct when he purportedly vouched for witnesses' credibility. Enriquez also contends the prosecutor committed misconduct by referring to matters outside the record in remarks about gangs. Gutierrez argues the prosecutor committed misconduct by misstating the law, the state of the evidence, and arguing facts not in evidence surrounding Yesenia Ortega's testimony and testimony from Fuller. Finally, Gutierrez claims the prosecutor committed misconduct by misstating the law on accomplice corroboration.

> "'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Prosecutorial misconduct requires reversal only if it prejudices the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required, unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates only state

law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

"'It is misconduct for prosecutors to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.]'" (*People v. Riggs* (2008) 44 Cal.4th 248, 302.) Improper vouching also includes "'"an attempt to bolster a witness by reference to facts outside the record."'" [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) It also is misconduct for a prosecutor to suggest to the jury that he or she possesses information about the case, other than evidence adduced at trial. The misconduct is in leading the jury to assess the merits of the case based upon information to which the prosecutor, but not the jury, is privy. (*People v. Earp* (1999) 20 Cal.4th 826, 864.)

### *Vouching*

Concerning Schuetze, the prosecutor argued there was no evidence anything about her testimony "was contrived" and that "at last we arrive at the truth from [her] testimony." Regarding Fuller, the prosecutor stated that there was "far too much corroboration in his story," his testimony was "very reliable," and "[h]e signed a document promising to tell the truth and nobody influenced what he was going to say." Defense counsel objected to the remarks by the prosecutor, which the trial court overruled.

The prosecutor also stated in closing that "[t]he only reasonable explanation presented by the facts" is that the account of events given by Trevino, Schuetze, and Fuller "are at long last the truth." Regarding Officer Nicole Shihrer, the prosecutor stated, "It's her job to get this right" and "If your opinion about … police officers in general is so low as to believe that [she would omit exculpatory evidence], then, we may as well stop calling cops to the stand." Defense counsel objected on the basis of vouching and was overruled.

Finally, the prosecutor argued that the witnesses had no motive to lie because of the immunity agreement. Defense counsel objected and the trial court overruled the vouching objection, noting the immunity agreement required each witness to testify truthfully.

Here, the prosecutor stated that witnesses were telling the truth based upon an assessment of testimony in the case, the evidence presented, and the terms of the immunity agreement.

The prosecutor essentially argued that Schuetze and Fuller were finally telling the truth at trial. Schuetze had lied to law enforcement initially. It was not until later that Schuetze was forthcoming to law enforcement in an interview and at trial. Fuller also initially lied about events and his inconsistent statements were before the jury. The prosecutor arguing that witnesses finally were telling the truth at trial does not constitute improper vouching for a witness. When a prosecutor states an opinion that a witness is telling the truth, without implying any knowledge of facts outside the record as the basis for this opinion, the prosecutor simply is stating an opinion on the basis of evidence before the jury; this is not misconduct. (*People v. Mayfield* (1997) 14 Cal.4th 668, 781-782.)

Regarding Trevino, the prosecutor argued that Trevino was telling the truth from the inception, with the omission of the information that it was he who had hidden the gun. Again, as long as the prosecutor's assurances regarding the honesty or reliability of the witness are based on the facts of the record, and the inference is reasonably drawn therefrom rather than from any purported knowledge or belief, the comments cannot be characterized as improper vouching. (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

As for the contention regarding the prosecutor's remarks about the immunity agreements with Trevino and Fuller, the record discloses that the prosecutor explained the immunity agreement with Fuller. The prosecutor argued that Fuller agreed to testify truthfully and no one influenced what he would say. Describing the terms of the

immunity agreement is permissible argument. The prosecutor's later remarks about whether Fuller and Trevino had a motive to lie with an immunity agreement in place were remarks in response to the defense argument that Fuller and Trevino lied during trial. A prosecutor may make remarks that are responsive to defense argument and based on the record evidence in rebuttal, even if "perhaps otherwise improper." (*People v. Hill* (1967) 66 Cal.2d 536, 560.)

Even if any of the remarks were arguably improper, they were not prejudicial. The jury was instructed that nothing the attorneys say in their opening statements and closing arguments is evidence, and that the jury alone judged the credibility of witnesses. We presume the jury understood and followed those instructions in the absence of a showing to the contrary; here, there has been no such showing. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1327-1328 (*Alfaro*).)

### *Gang Reference*

Enriquez contends the prosecutor committed misconduct by referring in closing argument to matters regarding criminal street gangs that were outside the record. The contention is not cognizable on appeal.

The comments Enriquez asserts constituted prosecutorial misconduct were made by the prosecutor in closing, where he stated:

> "As I said, in the world of criminal street gang[s], disputes are settled by violence, even by slight ones. Even by ones that we take for granted every day, disrespect. But this case is important because it offers the lawful law abiding community an opportunity to say no."

At trial, Gutierrez objected to the above remarks; Enriquez did not. Failure to object and seek a curative admonition forfeits appellate review of any claim of prosecutorial misconduct. (*People v. Foster* (2010) 50 Cal.4th 1301, 1354 (*Foster*).)

Regardless, the prosecutor's remarks do not rise to the level of misconduct. In analyzing claims of prosecutorial misconduct, we view the challenged statements in the context of the argument as a whole (*People v. Dennis* (1998) 17 Cal.4th 468, 522

(*Dennis*)), and "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*Frye, supra,* 18 Cal.4th at p. 970.) The prosecutor's remarks reasonably can be viewed as urging the jury to hold defendants accountable for their criminal conduct -- not for any actions of gangs in general.

### *Ortega Testimony*

Gutierrez contends the prosecutor committed misconduct by arguing in rebuttal that Ortega fabricated her testimony that Trevino confessed to being the gunman and stating there was no evidence "in this record" or "before this jury" identifying Trevino as the gunman. We reject the claim of prosecutorial misconduct.

Gutierrez did object to the remark on the grounds the prosecutor misstated the record. The trial court responded, stating, "The jurors know what the evidence is, and they will know if there's other evidence or[] not[,] so I will overrule the objection."

Multiple times in closing argument the prosecutor mentioned Ortega's testimony that Trevino told her he was the gunman. The prosecutor repeatedly argued that Ortega was lying and could not be trusted. In rebuttal, the prosecutor again addressed Ortega's testimony that Trevino confessed to being the gunman. Finally, in his last comment on the matter, the prosecutor made the challenged remark.

Viewed in context, the remark could not reasonably be construed as the prosecutor misstating the record. There were too many instances when the prosecutor specifically referenced Ortega's testimony regarding Trevino. Rather, the reasonable interpretation of the remark is that the prosecutor was arguing there was no evidence before the jury because Ortega's testimony was not *credible* evidence that was worthy of the jury's consideration. Because we conclude there was no prosecutorial misconduct in making the remark, we summarily reject Gutierrez's claim of a violation of due process.

We also reject Gutierrez's contention that the manner in which the trial court overruled his defense counsel's objection was a "scolding" and biased the jury against

him.  In *People v. Hill, supra,* 17 Cal.4th 800, upon which Gutierrez relies, the prosecutor committed misconduct on numerous occasions, the trial court repeatedly overruled the defense objections to the misconduct, and eventually the trial court chastised defense counsel for making the objections.  (*Id.* at pp. 823-839.)  That is not the case here.  There were not repeated instances of misconduct by the prosecutor where objections by defense were overruled.  For the trial court on one occasion to ask defense counsel to state the basis for an objection, without arguing the evidence, simply does not rise to the level of a "scolding" as Gutierrez claims and would not have biased the jury.

### Fuller's Testimony

Gutierrez argues the prosecutor committed misconduct by stating that Ramos had learned inside information from Enriquez, who in turn communicated it to Ortega, when the two defendants were able to communicate on a bus ride to jail.  Gutierrez contends this was misconduct because that information was testified to by Fuller at an Evidence Code section 402 hearing, but not during the trial.

Gutierrez failed to object to this remark, although counsel for a codefendant did.  Failure to object and seek a curative admonition forfeits appellate review of any claim of prosecutorial misconduct.  (*Foster, supra,* 50 Cal.4th at p. 1354.)  Gutierrez has forfeited any claim of prosecutorial misconduct in this instance.

The case of *People v. Lopez* (2013) 56 Cal.4th 1028 cited by Gutierrez does not warrant a different conclusion.  In *Lopez,* the prosecutor made the same disparaging remark about both defense counsel jointly; one defense attorney interposed an objection, which was sustained.  On appeal, the California Supreme Court determined that an objection from the second defense counsel was not necessary in order to preserve the claim of prosecutorial misconduct for appeal by both defendants because the remark had been made about both defense counsel.  (*Id.* at p. 1073.)

Here, the alleged prosecutorial misconduct related to Ramos and Enriquez, not Gutierrez. In order to preserve a claim of prosecutorial misconduct for appeal, Gutierrez should have objected to the remark during trial.

### *Accomplice Corroboration Remark*

Gutierrez argues the prosecutor committed misconduct by stating in rebuttal argument that one accomplice can corroborate the testimony of another accomplice, which he contends is a misstatement of the law. Gutierrez misconstrues the remark.

The prosecutor stated, "While you need independent corroboration to be legally sufficient, the corroboration between two accomplices as long as there is the independent corroboration, it is certainly something you can take into consideration and it's certainly something you can factor in." The prosecutor also remarked that with respect to prosecution witnesses, "But their stories match up and corroborate each other." Other similar comments to these two were made by the prosecutor.

Section 1111 requires corroboration of accomplice testimony. It provides, in pertinent part, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "'The evidence required for corroboration of an accomplice "need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citations.] Moreover, evidence of corroboration is sufficient if it connects defendant with the crime, although such evidence "is slight and entitled, when standing by itself, to

49.

but little consideration." [Citations.]' [Citations.]" (*People v. Garrison* (1989) 47 Cal.3d 746, 773.)

It is true that "In order to corroborate the testimony of an accomplice the prosecution must introduce independent evidence which of itself connects the defendant with the crime without any aid from the testimony of an accomplice." (*People v. Luker* (1965) 63 Cal.2d 464, 469.) Such evidence may not come from the testimony of other accomplices. (*People v. Davis* (2005) 36 Cal.4th 510, 543.)

We do not interpret the prosecutor's remarks as Gutierrez would suggest. The prosecutor clearly stated and acknowledged that accomplice testimony must have independent corroboration. To state that as long as there was independent corroboration, the jury could "factor in" that the accomplices' testimony was consistent is not a misstatement of law on corroboration of accomplice testimony. We see nothing in the prosecutor's remarks that would have allowed the jury, as Gutierrez claims, to use an "amalgam" of independent evidence and other accomplice testimony as corroboration for an accomplice's testimony.

Moreover, the jury was specifically instructed that "The evidence needed to support the statements or testimony of one accomplice cannot be provided by the statements or testimony of another accomplice." Absent evidence to the contrary, and none has been cited by Gutierrez, we presume the jury followed this instruction. (*Alfaro, supra,* 41 Cal.4th at pp. 1327-1328.)

## VII. Ineffective Assistance of Counsel

Gutierrez contends his defense counsel rendered ineffective assistance when counsel failed to object to certain portions of Schuetze's testimony.

The familiar standard for review of claims of effective assistance of counsel is that the defendant must show (1) trial counsel failed to act in a manner to be expected of reasonably competent attorneys, and (2) a more favorable result would have been obtained absent counsel's failings. (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) "If the

record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

During the direct examination of Schuetze, she testified to seeing Gutierrez get into the SUV and leave. During cross-examination by Ramos's counsel, Schuetze testified she was looking out a window and saw the SUV leave. When Enriquez's counsel cross-examined Schuetze, Schuetze testified that she saw the SUV leave, but "didn't pay attention to who got in and out." Schuetze also acknowledged that she did not see who got into the SUV, but "put two and two together." On redirect, Schuetze acknowledged initially telling police she saw who got into the SUV and that now her testimony was that she did not actually see who got into the SUV, but she assumed Gutierrez and Enriquez were in the SUV because she did not see them after the SUV left.

Gutierrez contends defense counsel was ineffective because he failed to object—on the grounds it assumed facts not in evidence—to Schuetze's testimony that she saw Gutierrez leave the motel in the SUV. Gutierrez also contends defense counsel was ineffective for failing to move to strike for lack of foundation this same testimony when it was revealed that Schuetze was basing her testimony on an assumption.

As was revealed during questioning of Schuetze on redirect, prior to the trial she had told law enforcement that she saw who got into the SUV. When Schuetze testified initially on direct examination, her testimony was consistent with her pretrial statement to law enforcement. Schuetze's pretrial comments would have been available to the defense and certainly precluded any objection, at that time, on the basis of assuming facts not in evidence.

Concerning defense counsel's failure to object to certain of Schuetze's testimony, "[f]ailure to object rarely constitutes constitutionally ineffective legal representation." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) The decision whether to object is

51.

inherently tactical, and the failure to object rarely will establish ineffective assistance. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)  Here, at the time Schuetze initially testified, there was no basis for an objection on the grounds suggested by Gutierrez.

When it became clear under cross-examination that Schuetze had assumed Gutierrez and others left in the SUV because they were no longer at the motel after the SUV left the parking lot, Gutierrez contends defense counsel should have moved to strike Schuetze's earlier testimony on the grounds of a lack of personal knowledge.  Again, considering that cross-examination and redirect thoroughly fleshed out exactly what Schuetze observed, as opposed to the conclusions she drew, defense counsel reasonably could decide tactically not to pursue the matter further.

With regard to the question of whether counsel's performance was objectively unreasonable, "'"Reviewing courts defer to counsel's reasonable tactical decisions … and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  [Citations.]  "[W]e accord great deference to counsel's tactical decisions" [citation], and … "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation].'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254; accord, *People v. Weaver* (2001) 26 Cal.4th 876, 928 ["'even "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel"'"].)  And, "[i]n order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission.  [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.)  "'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*Jones,* at p. 1254.)

On the record before us, we conclude there was no ineffective assistance of counsel.

## VIII. Gang Registration Requirement

Ramos contends the gang registration requirement set forth in the abstract of judgment should be reversed because it was not orally imposed at sentencing. He is mistaken.

The abstract of judgment must reflect the court's oral pronouncement of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) "The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment. [Citation.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 387-388.)

The gang registration requirement is set forth in section 186.30 and requires that any person convicted of a gang offense or gang enhancement set forth in section 186.22, subdivisions (a) and (b), respectively, must register with law enforcement. At sentencing, the trial court stated, "I will further order that [Ramos] register under the provision of Section 186.30."

The abstract of judgment conforms to the oral pronouncement of judgment, which included the gang registration requirement.

## DISPOSITION

The judgments are affirmed.

_____
CORNELL, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.

53.